## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
## COURT FILE NO. 23-CV-173

| | |
|---|---|
| Vista Enterprises LLC and Kirstyn Indgjer, <br><br> Plaintiffs, <br><br> v. <br><br> Northwoods Management LLC and Matthew Onofrio, <br><br> Defendants. | **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## I. INTRODUCTION

1.    Matt Onofrio holds himself out to the public as someone who has cracked the code in real estate investing, claiming that after just a few short years of investing, he has made millions of dollars and has closed hundreds of millions of dollars in real estate deals.

2.    He claims that the key to his success is investing in "triple net lease" properties. These are typically commercial properties where the tenant pays all of the expenses associated with the property, presumably allowing the owner to reap the benefits of real estate ownership without having to shoulder most of routine costs of the property.

3.    Onofrio's success, however, did not come from buying, holding, and
selling these rental properties – as implied. Rather, Onofrio makes his
money by serving as middleman in commercial real estate sales.
Specifically, he finds a commercial property for sale and enters into a
purchase agreement with the seller then, using his soapbox through
podcasts and other media, finds aspiring real estate investors who he
can flip the property to, and take a large fee for doing so.

4.    In the end, through his scheme, Onofrio assures a large payout for
himself while not taking on any of the risks and responsibilities of
ownership, and leaves his victims with a property that they overpaid for,
and which may or may not succeed as an investment.

5.    One of these aspiring real estate investors was Kirstyn Indgjer. She
heard Onofrio interviewed on a popular real estate investing podcast
and reached out to him about investing. As it happened, he had
property in Columbus, Wisconsin that seemed like a good fit for her.
Trusting Onofrio, Indgjer moved forward with the deal.

6.    Onofrio controlled every aspect of Indgjer's purchase and pushed her
forward, making assurances against any reservations she had. In the
end, Indgjer was left with a commercial property that did not live up to

the promises made by Onofrio and not worth what she paid for it. In exchange for her putting Indgjer into this deal, Onofrio took a $329,314 fee.

7.    Onofrio's actions were illegal. First, he was acting as a real estate broker without a broker's license. As a result, any fee he collected was also illegal and must be returned to Indgjer. Second, Onofrio was negligent by making reckless and false projections about the property to induce Indgjer into the purchase.

8.    Due to Onofrio's actions, Indgjer is entitled to a return of the fee she paid to Onofrio for brokering the purchase of the property and is entitled to actual damages resulting from Onofrio's negligence.

## II. PARTIES

9.    Plaintiff Vista Enterprises LLC is a Minnesota limited liability company with its registered office in Rochester, Minnesota.

10.   Vista Enterprises is solely owned by Kirstyn Indgjer, a resident of the State of New York.

11.   Vista Enterprises owns real property in Columbia County, Wisconsin, located at 302 Industrial Drive, Columbus, Wisconsin (the "Property").

12. Defendant Northwoods Management LLC is a Minnesota limited liability company with its registered office in Rochester, Minnesota and its principal executive office located in Eau Claire, Wisconsin.

13. Northwoods Management LLC is solely owned by Defendant Matthew Onofrio, a resident of the State of Wisconsin.

### III. JURISDICTION AND VENUE

14. The United States District Court has jurisdiction over this matter under 28 U.S.C. § 1332(a)(1), Diversity of Citizenship, because no defendant holds citizenship in the same state where the plaintiff holds citizenship and the amount in controversy is in excess of $75,000.

15. An LLC's citizenship, for purposes of diversity jurisdiction, is the citizenship of each of its members. *Perez v. Staples Contract & Commercial LLC*, 31 F.4th 560, 567 (7th Cir. 2022). Consequently, Plaintiff Vista Enterprises LLC's citizenship is New York and Defendant Northwoods Management LLC's citizenship is Wisconsin. Defendant Onofrio's citizenship is also Wisconsin.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this judicial district and division, and the

property that is the subject of this action is located in this judicial

district and division. Venue is also proper in this Court pursuant to 28

U.S.C. § 1391(b) because one or more of Defendants reside in this

judicial district.

## IV. TRIAL BY JURY

17.    Plaintiff is entitled to and hereby respectfully demands a trial by jury on

all issues so triable.  US Const. amend. 7;  Fed. R. Civ. P. 38.

## V. FACTS

### A.    Kirstyn Indgjer connects with Matthew Onofrio after hearing him on a real estate investing podcast.

18.    Kirstyn Indgjer first connected with Matthew Onofrio in November,

2020 after hearing an interview with him on the "Bigger Pockets" real

estate investing podcast. On the podcast, Onofrio had discussed how

he formerly worked as a nurse anesthetist. This resonated with

Indgjer – as that was, and is currently, her profession.

19.    At the time, Onofrio held himself out as an experienced real estate

investor with an amazing track record. On one of his investing websites

"Wild Moose Ventures," he touts that:

Since 2019, he has done more than one hundred deals, and his personal holdings have expanded significantly. From his hard earned experience in sourcing to financing and management to mindset, Matt shows how someone from a completely different field can thrive in commercial real estate, and he aims to **break the stigma often associated with big commercial investing by making it accessible to investors of all levels.**[1]

20.   On another site, he claims that:

Although Matt's background is in medicine as a nurse anesthesiologist, he has a deep understanding of commercial real estate focused on Triple Net Investing. It was here that he found that missing piece in his life. Through self-discipline, books, podcasts, mentorship, masterminds, and a lot of hard work, Matt is now closing 25 deals a quarter, totaling over $200M.[2]

21.   Indeed, Onofrio regularly courts aspiring real estate investors, claiming that he can help them achieve their dreams through real estate. As he puts it on his website:

Matt's goal is to empower and educate more people to create passive wealth through commercial real estate investments and help to break the stigma often associated with big commercial deals. From financing, taxes,

---

[1] https://wildmooseventures.com/about/ (emphasis in original).

[2] https://mattonofrio.com.

mentorships, and more, Matt shows how someone from a completely different field can thrive in commercial real estate.

As he grows his own portfolio, Matt also helps other investors become financially free and get into their own commercial real estate deals![3]

22.   At this time, Indgjer had limited real estate investing experience. She owned two duplexes and was interested in expanding into a larger commercial property.

23.   Indgjer and Onofrio first corresponded by email. Indgjer told Onofrio about her desire to get into bigger real estate projects and Onofrio mentioned that he had a deal available near Madison, Wisconsin for $1,600,000. The two arranged a phone call to discuss the deal.

24.   Onofrio and Indgjer spoke by phone on or about November 23, 2020. In the call, Onofrio told Indgjer more about the project. The property was an office and warehouse building located in Columbus, Wisconsin. It was a "triple net lease" property — meaning that the tenant, in addition

---

[3] https://mattonofrio.com.

to paying rent and utilities, is responsible for all other costs related to the property, such as taxes, maintenance, and insurance. The property was occupied fully by a business called 'Officesupply.com' which, as the name suggests, sells office supplies online. The business is a subsidiary of Office Depot.

25.  They discussed the necessary down payment in the call. Onofrio told her that it was $350,000. Indgjer informed Onofrio that that was more than she was comfortable with but could put down $250,000. Onofrio told her that he could wire her the difference so it would look like she had the full amount of the down payment when applying for financing and could loan her the needed amount. Indgjer declined this strategy and told Onofrio that she did not want to do anything that would misdirect a bank.

26.  Onofrio told Indgjer that this was an "off market" deal. He also told her that there was another interested buyer, so she should act quickly if she was interested in the property.

27.  In their call, Indgjer asked if Onofrio was a broker. He said he was not. He told her that he was a "wholesaler" and that he had a property management company, Northwoods Management.

28.   They closed out the call discussing next steps. Onofrio told Indgjer that he had connections at Premier Bank and would look into financing for her. Onofrio asked Indgjer to send him a personal financial statement and a letter outlining her previous real estate investing experience, which he would need to provide to the bank.

**B.   Indgjer agrees to purchase the Columbia, Wisconsin property. Onofrio controls every aspect of the deal.**

29.   On November 27, 2020, Indgjer followed up with Onofrio by email to inquire if the Property was still available and the two continued the conversation by phone. Onofrio conveyed a sense of urgency to her about moving the deal forward. Onofrio requested that she provide him her past two years' of tax returns, which he needed for Premier Bank. Indgjer suggested that she work with the bank directly on the financing, but Onofrio insisted that he handle all communications with the bank.

30.   On this same date, Onofrio set up a purchase agreement for the Property for Indgjer's electronic signature, which Indgjer signed. The purchase agreement set a purchase price of $1,604,214. The purchase agreement listed Onofrio as the seller.

31.   Over the next several days, Onofrio moved the purchase forward. He sought additional information from Indgjer, such as paystubs, for the

bank, and arranged for Indgjer to deposit $12,000 in earnest money with a title company.

32.   The title company, chosen by Onofrio, was Title Services, Inc. Title Services Inc.'s CEO is Daniel Berndt, who is an attorney at Dunlop & Seeger, P.A., a law firm that, upon information and belief, routinely provides legal services for Onofrio. Upon information and belief, Title Services, Inc. shares common ownership with Dunlop & Seeger, P.A.

33.   Shortly after this, Onofrio notified Indgjer that Premier Bank declined her financing. In their phone call, Onofrio sounded irritated, stating that couldn't believe that the bank would not finance her, because he knew the representative at the bank.

34.   Onofrio told Indgjer that he would reach out to other banks for financing. Indgjer told him that she would seek financing on her own. Onofrio told Indgjer not to do this and insisted that he be the one to line up her financing.

35.   Eventually, Onofrio found potential financing with American Bank of Beaver Dam. Again, Onofrio served as the go-between for Indgjer and the bank. Any contact concerning Indgjer's financing was handled by Onofrio or, in the event that Indgjer had direct contact with the bank,

Onofrio was copied on emails. During Indgjer's one phone call with the bank, Onofrio was on the call as well.

36.    American Bank of Beaver Dam preliminarily approved Indgjer's financing so Indgjer proceeded forward with the transaction.

37.    Indgjer wanted to conduct basic due diligence on the property; but Onofrio continued to control the process. For example, Indgjer inquired about getting an inspection of the property, but Onofrio told her she did not need one.

38.    Additionally, Indgjer wanted to contact the seller of the property; but Onofrio would not provide her the contact information of the seller, and told her it would be a "conflict of interest" for Indgjer to contact them.

39.    Indgjer wanted to contact the tenant in the property to learn about them and wanted to obtain their financial information to get a sense of their ability to pay the rent; but Onofrio would not let her contact the tenant. He told her that she did not need the financials because the tenant had been paying the rent. Onofrio provided the lease to Indgjer, but no other information,

40.   Onofrio controlled every aspect of the transaction. Onofrio obtained Indgjer's insurance and, when Indgjer told him that she wanted to use an attorney to represent her in the purchase, Onofrio referred her to his attorney — Daniel Berndt at Dunlap & Seeger — and insisted that she use him.

41.   During this process, Onofrio, repeatedly coaxed her to proceed with the purchase and talked up its benefits. Onofrio told her that business was booming for the tenant and that it had a "COVID-proof" business model. He told her that the building would be full of people after the pandemic. He touted that this was going to be a long-term, stable investment. He said this was so because the building had an established tenant since 2008 and they have kept of the building and never missed a payment.

### C.   Onofrio collects an illegal fee in connection with the transaction.

42.   The sale closed on January 29, 2021. Indgjer had formed Vista Enterprises LLC as a holding company for the building and therefore was closing on behalf of this entity.

43.   Indgjer signed the closing documents using a remote closer. During her
      closing, Onofrio and a representative of American Bank of Beaver Dam
      were on the phone with her.

44.   Onofrio aggressively pushed Indgjer to sign the documents and close
      the purchase, despite several questions that she raised. Onofrio
      repeatedly assured her that everything was standard.

45.   Notably, the closing documents showed that Onofrio was not the seller
      of the property — despite him being stated as the seller in the purchase
      agreement. The Seller was an entity named 302 Associates LLC.

46.   At the closing, Indgjer reviewed the closing statement, which contained
      an itemization of debits and credits related to the purchase. Included on
      this was an "assignment fee" of $329,314 payable to Onofrio's
      company, Northwoods Management.

47.   Onofrio had never before informed Indgjer of this fee. Onofrio told her
      he was taking it because he was "acting as a broker" and that it was
      "wholesaler fee."

48.   Wholesaling is a scheme where a person enters into an agreement to
      purchase a real estate property from a seller, and then turns around

and seeks a buyer for the property, yet at a higher price then they agreed to pay the seller. The wholesaler then — without ever owning the property — keeps the difference as a fee for themselves.

49.   Onofrio told her that it did not matter that she was paying him this fee because she'd otherwise just be paying it to a real estate broker.

50.   Onofrio is not a licensed real estate broker in the State of Wisconsin, or any state. Despite this, he collected a $329,314 fee from the sale of this property. This is illegal under Wisconsin law.

51.   Shortly before the closing, Indgjer, on behalf Vista and herself as a personal guarantor, entered into the promissory note with Northwoods Management LLC for payment of $70,843.00 which Onofrio claimed that he was fronting toward the down payment. The note required monthly interest payments of $236, with a balloon payment due for the full balance on February 10, 2024.

52.   The total amount paid by Indgjer and Vista for the Property was $1,610,771 including closing costs. This was funded by the $12,000 in earnest money paid by Indgjer, $1,283,371 via the American Bank of Beaver Dam mortgage $70,843 via the note with Northwoods, and an additional $231,020.37 paid in cash by Indgjer via wire.

14

**D.     The property does not perform as promised by Onofrio.**

53.     Soon after the closing, Indgjer began to have concerns about the

Property. She visited the Property a couple of weeks after closing and,

instead of finding a bustling business operating at the Property, it was

mostly vacant. There were no employees working in the office or

warehouse, and the warehouse was mostly empty, with no sign of

activity. She discovered that, at the time, only one Officesupply.com

employee routinely visited the Property.

54.     Despite that the Property was mostly vacant, the tenant did continue

paying rent; however, the lack of use of the Property by the tenant

raised significant concern for Indgjer that the tenant would not opt to

renew the lease when the lease term was up in December, 2024. If the

tenant declined to renew the lease, Indgjer could be left with an empty

property and therefore no rental income to cover the costs of the

building.

55.     Indgjer later spoke with the owner of Officesupply.com about the lease.

He told Indgjer that Officesupply.com's parent company, Office Depot,

was shutting down its real estate division, and therefore he had no

certainty if they would use this property anymore after the lease ran

out.

56.   In the spring of 2022, Indgjer listed the property for sale for $1,600,000. The property was actively listed for six months. She received one "lowball" offer of $500,000.

57.   Indgjer's entity Vista Enterprises LLC still presently owns the Property.

## VI. LEGAL CLAIMS

### COUNT I
### Avoidance of Contract
### Northwoods Management, Onofrio

58.   Plaintiff incorporates all above facts by reference.

59.   Courts may determine rights, status, and other legal relations of parties to a contract. Wis. Stat. § 806.04.

60.   In Wisconsin, if a person acts as a real estate broker without a license, a contract for a commission for real estate brokerage activities is void from its inception.

61.   As set forth above, Onofrio and Northwoods management acted as a real estate broker in connection with Vista Enterprises' purchase of the Columbus, Wisconsin Property.

62.   Vista Enterprises entered into a contract with Onofrio and Northwoods Management's purchase of the Property. Namely, through the purchase

of the Property, Vista consented to pay Northwoods Management

$329,314 in exchange for Onofrio and Northwoods' Management's

brokerage services.

63.   Vista Enterprises is entitled to an order voiding its agreement to pay

Northwoods Management its fee for brokering Vista's purchase of the

Columbus, Wisconsin property and an order requiring the return of all

payments made to Northwoods Management in exchange for Onofrio

and Northwood Management's brokerage services.

## COUNT II
## Declaration that the Note is Void
## Northwoods Management

64.   Plaintiff incorporates all above facts by reference.

65.   Courts may determine rights, status, and other legal relations of parties

to a contract. Wis. Stat. § 806.04.

66.   Onofrio collected an illegal fee by taking a fee, commission or other

valuable consideration, for negotiating the sale of the Property to Vista

Enterprises LLC.

67.   A contract to pay for services is void when the service provider lacked

a statutorily required license to perform the services.

68.   Onofrio used the Northwoods Management promissory note as instrument to collect his illegal fee.

69.   Vista Enterprises and Indgjer are therefore entitled to an order declaring that the promissory note and guaranty with Northwoods Management is void.

**COUNT III**
**Negligence**
**Northwoods Management, Onofrio**

70.   Plaintiff incorporates all above facts by reference.

71.   The elements of negligence are: (1) the existence of a duty of care; (2) a breach of that duty; (3) an injury; and (4) the breach of the duty being the proximate cause of the injury.

72.   Vista Enterprises is owned by Kirstyn Indgjer and serves as a holding company for the Property.

73.   Onofrio owed Vista Enterprises and Indgjer a duty of care because, although he was not licensed as a real estate broker, he served as a real estate broker in connection with Vista Enterprises' purchase of the Property. Real estate brokers owe their clients a duty of care. Further, Onofrio held himself out to Indgjer as an expert in real estate and took

on the role of advising Indgjer and brokering the transaction with the appearance of working on Indgjer's behalf.

74.     Even if Onofrio were not acting as Indgjer's broker he owed her a duty of care against false or reckless representations as a party to the real estate transaction.

75.     Onofrio breached that duty of care. Onofrio was reckless in providing Indgjer with information about the property including his repeated assurances that this was a good investment.

76.     Onofrio's breach proximately caused injury to Vista Enterprises. Onofrio induced Indgjer to purchase the Property by his reckless and false projections and other information about the Property. But for Onofrio's actions, Indgjer and Vista Enterprises would not have purchased the Property.

77.     Indgjer and Vista Enterprises were damaged by Onofrio's representations. Indgjer and Vista Enterprises purchased a property that was not worth the amount paid.

78.     Due to Onofrio's negligence, Vista Enterprises is entitled to actual

        damages against Onofrio and Northwoods Management to be

        determined at trial.

## COUNT IV
### Negligent Misrepresentation
### Northwoods Management, Onofrio

79.     Plaintiff incorporates all above facts by reference.

80.     The elements of negligent misrepresentation are that: (1) the defendant

        made a factual representation; (2) which was untrue; (3) which plaintiff

        believed to be true and relied on to their detriment; and (4) the

        defendant breached their duty of care to plaintiff in making the

        representation at issue.

81.     Onofrio made several factual representations about the Property to

        Indgjer. These included that business was booming for the tenant, that

        it had a "COVID-proof" business model, that the building would be full

        of people after the pandemic, and that this was going to be a long-term,

        stable investment.

82.     These representations were untrue. The reality was that the tenant was

        only minimally using the Property and was at risk of not renewing the

        lease in 2024.

83. Indgjer relied on these representations to her detriment. Had Onofrio not made them, she would not have proceeded with the purchase and was then saddled with a Property not worth what she paid for it.

84. Onofrio breached his duty of care in making the representations. Onofrio had a duty of care to Indgjer by posing as her advisor and as a party to the transaction. Onofrio breached his duty by making these statements recklessly without regard for the truth.

85. Due to Onofrio's negligent misrepresentation, Vista Enterprises is entitled to actual damages against Onofrio and Northwoods Management to be determined at trial.

## COUNT V
### Intentional Misrepresentation
### Northwoods Management, Onofrio

86. Plaintiff incorporates all above facts by reference.

87. The elements of intentional misrepresentation are that: (1) the defendant made a factual representation; (2) which was untrue; (3) the defendant either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false; (4) the defendant made the representation with intent to defraud and to induce

another to act upon it; and (5) the plaintiff believed the statement to be true and relied on it to their detriment.

88.   Onofrio made several factual representations about the Property to Indgjer. These included that business was booming for the tenant, that it had a "COVID-proof" business model, that the building would be full of people after the pandemic, and that this was going to be a long-term, stable investment.

89.   These representations were untrue. The reality was that the tenant was only minimally using the Property and was at risk of not renewing the lease in 2024.

90.   Onofrio made these representations to Indgjer knowing they were untrue or made it recklessly without caring whether they were true or false. Given that the real picture of the Property was very different than what Onofrio proclaimed, he had to have known he was providing misinformation or simply did not care if he was accurate.

91.   Onofrio made the representations with intent to defraud and to induce another Indgjer act upon them. Indgjer attempted to be diligent in her purchase of the Property and Onofrio controlled the flow of information with the sole goal of getting the deal done and collecting his fee. The

fee was his motivation and he made these representations to give Indgjer false comfort and proceed with the purchase.

92.     Indgjer believed Onofrio and relied on these representations to her detriment. Had Onofrio not made them, she would not have proceeded with the purchase. She was then saddled with a Property not worth what she paid for it.

93.     Due to Onofrio's intentional misrepresentation, Vista Enterprises is entitled to actual damages against Onofrio and Northwoods Management to be determined at trial.

## COUNT VI
### Unjust Enrichment
### Northwoods Management, Onofrio

94.     Plaintiff incorporates all above facts by reference.

95.     The elements of an unjust-enrichment claim are that: (1) a benefit be conferred by the plaintiff on the defendant; (2) the defendant accept the benefit; (3) the defendant retain the benefit although retaining it without payment is inequitable.

96.   Northwoods Management received a benefit from Vista Enterprises in the form of the fee received for its illegal brokerage services and payments made toward the promissory note.

97.   Northwoods Management accepted the benefit by accepting those payments.

98.   It would be inequitable for Northwoods to retain the benefits of those payments because they were received as payment for services that were illegal for Onofrio to provide, toward a promissory note which was entered into for the purpose of collecting an illegal fee, and which were provided negligently.

99.   Under the doctrine of unjust enrichment, Vista Enterprises is entitled to damages equal to the amount paid to Northwoods Management for the assignment fee and as payments on the promissory note.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully asks this Court to award judgment as follows:

1.   An order declaring that the contract that Vista Enterprises pay Northwoods Management and Onofrio a fee of $329,314 in exchange

for Onofrio and Northwoods performing services of a broker for Vista Enterprises' purchase of the Property is void.

2.    A money judgment in favor of Vista Enterprises and against Northwoods Management and Onofrio in the amount of $329,314 due to their receipt of this amount under a void contract.

3.    An order declaring that the promissory note by Vista Enterprises and guaranteed by Indgjer is void.

4.    A money judgment in favor of Vista enterprises and against Northwoods Management in the amount of payments received by Northwoods Management under the note.

5.    A money judgment in the amount of actual damages incurred by Vista Enterprises due to Northwoods Management's and Onofrio's negligence, to be determined at trial.

6.    In the alternative to amounts prayed for above, under the doctrine of unjust enrichment, a money judgment for damages equal to the amount paid to Northwoods Management for the assignment fee and as payments on the promissory note, to be determined at trial.

**WAYPOINT LAW PLLC**

Dated: March 17, 2023             /s/ Daniel M. Eaton
                                   Daniel M. Eaton[*]
                                   333 Washington Ave. N.
                                   Suite 300
                                   Minneapolis MN 55401
                                   Ph: (612) 445-7596
                                   dan@waypoint.law

                                   ATTORNEY FOR PLAINTIFF

---

[*] Admitted to practice in the Western District of Wisconsin.

26